UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                                    Case No. 13-20271

      Plaintiff,

                                    Hon. Denise Page Hood

v.

LEON TRENTON-GERALD BINFORD,

      Defendant.

_____/

ORDER REGARDING MOTIONS TO SUPPRESS,
MOTION FOR REVOCATION OF DETENTION ORDER,
and RESCHEDULING TRIAL DATE

I.      BACKGROUND

On April 9, 2013, the grand jury indicted Defendant Leon Trenton-Gerald Binford with three counts: Felon in Possession of a Firearm, 18 U.S.C. § 922( g)(1) (Count One); Possession with Intent to Distribute Marijuana, 21 U.S.C. § 841(a)(1) (Count Two); Possessing a Firearm in Furtherance of a Drug Trafficking Crime, 18 U.S.C. § 924(c) (Count Three); and a forfeiture allegation as to the firearm and ammunition involved. The Magistrate Judge ordered Defendant detained pending trial, finding that this matter is a rebuttable presumption case and that Defendant failed to rebut the presumption. (Doc. No. 23)

A search warrant was issued on October 1, 2012 and executed on October 2,

2012 for 16300 West 9 Mile Road, Apartment 313, Southfield, Michigan, in the Providence Towers Apartment Complex. The affiant is a Southfield Police Department detective, Paul Kinal (Kinal). The property was to be searched and the items to be seized included controlled substances, related documents and paraphernalia, related materials, firearms and proof of residence. (Aff. ¶ 2) Kinal had received information from a confidential informant (CI) that a black male in his late 20s with the street name "JB" was trafficking a large quantity of marijuana from his apartment and that he would meet prospective customers in the parking lot and often sit in a white plastic lawn chair. (Aff., ¶ 3(E)) Law enforcement conducted surveillance of the apartment building, specifically the third floor of the apartment building, and searched the CLEAR database for the identification of JB. (Aff., ¶ 3(F)) Two controlled purchases were made prior to the application of the search warrant. These purchases when field tested returned positive for marijuana. (Aff., ¶¶ 3(G)-(J))

The Oakland County Narcotics detectives (NET) and the Southfield Police Special Entry and Response Team (SERT) executed the search warrant on October 2, 2012. The police knocked on the front door and when there was no response, forced the front door open. SERT located Defendant near the doorway and Tia Brooks (his girlfriend) and their child in the bedroom. Defendant was secured with no incident and the apartment was searched by the NET detectives. (Case Report)

2

While in the apartment, Defendant was given a Miranda Warning form. Kinal asked Defendant if he understood the form and to place his initials next to each Constitutional right listed if Defendant understood the right and agreed to waive such right. (Case Report; Miranda form) Defendant waived and initialed each right. (Miranda form) Defendant signed and dated the form at October 2, 2012, 7:30 a.m. Defendant thereafter agreed to speak with Kinal. Defendant admitted to selling marijuana and having a gun in the bedroom closet for protection. He indicated he was recently discharged from parole and probation, selling the marijuana from a white plastic chair in the parking lot. (Case Report) Defendant was thereafter arrested and transported to the jail.

After the arraignment, a trial date was set for May 28, 2013, which was adjourned by stipulation of the parties to July 30, 2013. Defendant filed three motions on June 19, 2013: 1) Motion to Suppress Evidence Seized Pursuant to Search Warrant; 2) Motion to Suppress Evidence and Incriminating Statement; and, 3) Motion for Revocation of Detention Order. Responses were filed and an evidentiary hearing was held over three days: July 26, 2013, August 2, 2013 and August 9, 2013. The Court took the motions under advisement. For the reasons set forth below, the motions are denied.

## II.    ANALYSIS

A.     **Motion to Suppress Evidence Pursuant to Search Warrant and Obtain Evidentiary Hearing Pursuant to Frank v. Delaware**

1.     **Affidavit and Search Warrant**

Defendant seeks to suppress the items obtained after the search warrant was executed. Defendant seeks a hearing as to the veracity of the affidavit submitted with the application for the search warrant. The Government argues that the search warrant is proper and there is no need for an evidentiary hearing on the affidavit. However, at oral argument the Government and the Defendant presented witnesses.

Generally, the Fourth Amendment of the United States Constitution requires officers to obtain a warrant prior to conducting a search. *United States v. Smith,* 510 F.3d 641, 647 (6th Cir. 2007). "A warrant will be upheld if the affidavit provides a 'substantial basis' for the issuing magistrate to believe 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Id.* at 652 (quoting *Illinois v. Gates,* 462 U.S. 213, 238 (1983)). The probable cause standard is a "practical, non-technical conception" that leads with the "factual and practical considerations of everyday life." *United States v. Frazier,* 423 F.3d 526, 531 (6th Cir. 2005)(quoting *Gates,* 42 U.S. at 231). "Courts should review the sufficiency of the affidavit in a commonsense, rather than hyper technical manner." *United States v. Greene,* 250 F.3d 471, 479 (6th Cir. 2001). "[R]eview of an affidavit and search warrant should rely on a 'totality of the circumstances' determination, rather than a

4

line-by-line scrutiny." *Id.*    A magistrate judge's determination of probable cause should be paid great deference by a reviewing court. *United States v. Allen,* 211 F.3d 970, 973 (6th Cir. 2000)(en banc).  A court's review of the sufficiency of the evidence supporting probable cause is limited to the information presented in the four-corners of the affidavit and the court cannot consider any other testimony. *Frazier,* 423 F.3d at 531.  "To justify a search, the circumstances must indicate why evidence of illegal activity will be found 'in a particular place.'  There must, in other words, be a 'nexus between the place to be searched and the evidence sought.'"    *United States v. Carpenter,* 360 F.3d 591, 594 (6th Cir. 2004).

If an affidavit is found to be defective, the Supreme Court has held that the exclusionary rule be modified, "so as not to bar the admission of evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." *United States v. Leon,* 468 U.S. 897, 905 (1984).  Searches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer acted in good faith in conducting the search.  *Id.* at 922.  The good faith inquiry is to be made objectively and the following exceptions to the good faith inquiry may be considered: 1) the supporting affidavit contained knowing or reckless falsity; 2) the issuing magistrate wholly abandoned his or her judicial role; 3) the affidavit is so lacking in

5

probable cause to render official belief in its existence entirely unreasonable; or 4) the officer's reliance on the warrant was neither in good faith nor objectively reasonable. *Id*. at 923.

A defendant challenging the validity of an affidavit supporting a search warrant has a substantial burden to overcome before an evidentiary hearing is required. *Franks v. Delaware,* 438 U.S. 154, 171-72 (1978). Allegations of negligence or innocent mistake are insufficient. *Id.* There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof and must point out specifically the portion of the warrant affidavit that is claimed to be false. *Id.*

Defendant argues that apartment no. 313 is not visible from outside the building and that to access the apartment, a locked door must be unlocked, and an elevator or the stairs must be taken to reach the apartment. Defendant claims that the affidavit supporting the search warrant as to apartment no. 313 has no basis for probable cause and the statements therein were false. Defendant asserts he is entitled to a hearing under *Franks* and seeks suppression of the fruits of the search.

The Government argues that there was probable cause to issue the search warrant based on the affidavit. The affidavit asserts that the police conducted a search within the apartment building. The affidavit also asserts that after the CI shared the

6

information as to JB, information was sought from the apartment employees as to the identity of JB and based on this information, it was determined that JB resided in apartment no. 313 with his girlfriend and two small children.

The Court's review of the four-corners of the affidavit and the witnesses' testimonies shows there was sufficient probable cause to issue the search warrant. The affidavit describes the Providence Towers Apartment Complex specifically and the location of apartment no. 313. (Aff., ¶ 2) Surveillance was conducted on the third floor of the apartment building where, taking the testimony as a whole, Defendant was seen exiting apartment no. 313. Defendant was then seen exiting the building where he met the CI and the CI purchased marijuana from Defendant. (Aff., ¶ 3(G)) Defendant, still on surveillance, was seen returning back to the apartment building and apartment no. 313. (Aff., ¶ 3(G)) A second controlled purchase was conducted which, again, included surveillance of Defendant on the third floor of the apartment building. (Aff., ¶ I) The affidavit contains the specifics as to how the police connected Defendant to the third floor, specifically, apartment no. 313. Kinal's testimony elaborates and corroborates this affidavit. Defendant has not shown that the information in the affidavit contained any false statements. Defendant is not entitled to a *Franks* hearing. However, because the Government produced witnesses, the Court notes their testimony below. Even considering their testimony, the Court finds

Defendant's Motion to Suppress based on the search warrant must be denied.

### 2.      Testimony at Hearing

Several witnesses testified at trial and their testimonies were considered for both motions to suppress.

Officer Jared Womble (Womble), a Southfield police officer, was requested by Kinal, to assist with surveillance on two occasions. He had been shown a photo of the Defendant so as to be able to identify him at the apartment complex. Womble identified Defendant in court as well. Womble entered the apartment complex through an outside door opened with a key obtained from the apartment building management. Dressed in plainclothes, Womble stationed himself in the hallway near apartment no. 313, seated on the hallway floor with his cell phone plugged into an outlet. Womble testified that on that occasion, he saw Defendant return to apartment no. 313 and following this observation, he telephoned Kinal to report what he had seen.

Womble testified that on the second surveillance, he was also dressed in plainclothes and stationed in a similar position. He observed Defendant exit the apartment and exit toward the stairwell. He did not know whether Defendant went up or down the stairwell. He saw no one else exit or enter on the second occasion. After Defendant exited apartment no. 313, Womble contacted Kinal to report that Defendant

had exited.  On each occasion, Womble debriefed with Kinal at the Southfield Northland police station.  Womble prepared no report of his own.  On the first occasion, Womble only observed Defendant return, and on the second occasion, he only saw Defendant exit apartment no. 313.

Kinal arranged for the surveillance and controlled buys on the two occasions involving Womble.  Kinal had received information from a reliable informant that a man known as JB was selling marijuana outside the apartment complex at 16300 West Nine Mile Road on the north side of the building.  He was informed that the man sold from the parking lot and often sat in a white plastic lawn chair.  From the management of 16300 West Nine Mile Road apartment complex, Kinal learned that JB lived in apartment no. 313 with his girlfriend and one or two children.  Kinal used a data base at the Pontiac office to find that Tia Brooks and Leon Binford lived at that address. He then consulted a law enforcement data base to retrieve a photo of Binford.  Kinal identified Binford in court.  Kinal showed the photo he retrieved to his informant who identified the man in the photo as the person he knew as JB who was selling drugs at 16300 West Nine Mile Road.

Verifying the information against the lease agreement held by the management, Kinal obtained the key to the common outside down and arranged for surveillance of apartment no. 313 and a controlled buy by the CI.  Kinal posted Womble on

9

surveillance inside 16300 West Nine Mile Road near apartment no. 313.  Kinal also posted Detective James Shoemaker (Shoemaker), a member of NET and a Bloomfield Township police officer, as the "eye," a line of vision toward the location outside the apartment complex where the buys were to take place.  Shoemaker was on Cumberland St., just north of the apartment complex.  Kinal was south on West Nine Mile Road with an eastern view of the complex.  He had binoculars and controlled the CI.  Kinal was also equipped with a cell phone and a radio.

As customary, the CI was searched on each occasion for contraband and weapons, then given money to purchase drugs as part of the controlled buy.  On each occasion, Womble was instructed to communicate when Defendant exited and entered apartment no. 313.  Shoemaker was also to communicate when Binford exited the outside door and anything else he saw from his Cumberland St. position.

Kinal testified on each occasion, Womble indicated Defendant was on the move exiting the apartment.  Shoemaker then saw Defendant exit the building and saw the transaction occur at the fence near the lawn chair.  Kinal, upon the CI's return, searched him again and the CI turned over the marijuana he had purchased.  The two controlled buys took place a couple of weeks apart.  The substance the CI returned to Kinal after the controlled buys tested positive for marijuana.  Although Womble testified he only saw Defendant return after the first controlled buy, Kinal's

recollection was Womble reported to him that he saw him leave and return. Kinal did however recall that Womble only reported when Defendant left the apartment and not the return, on the second occasion. Nothing in the information obtained by Kinal suggested the availability of a large amount of drugs.

Shoemaker was part of Kinal's NET crew for 2 1/2 years. He was a police officer with Bloomfield Township for 12 years. Shoemaker's testimony was consistent with Kinal's. He had never worked with Womble before. The three, Kinal, Womble and Shoemaker, met at the Southfield Northland Police Department station and were assigned their roles. Shoemaker was to "see" the transaction. He set up with binoculars, cell phone and radio north of Cumberland. He had a clear view of the northeast wing of 16300 West Nine Mile Road, the exit door and the fence line. On the first occasion, Kinal radioed and Shoemaker then saw Defendant exit the building, walk to the chain link fence where he met the CI and engaged in a hand-to-hand transaction with the CI. Shoemaker then saw Defendant walk back to the building and enter the door he exited. Shoemaker had no doubt it was Defendant. On the second occasion, Shoemaker agreed he received the call Defendant had left the apartment. Shoemaker then saw Defendant exit the building and go to the fence where a hand-to-hand transaction occurred.

Keith Toupin (Toupin), a Southfield police officer and member of the SERT,

11

was contacted to participate in the search of 16300 West Nine Mile Road, apartment no. 313 in October 2012.  On the day of the search, members, approximately 8-12 in number, met at the police station at 26000 Evergreen Rd.  Most were dressed in black SERT uniforms with tactical vests and the word "POLICE" printed thereon.  Some had safety glasses and some wore "masks."  All were armed.  Kinal briefed everyone. The lead knocked on the door and announced "police."  There was no response and so the door was knocked open by force.  Toupin testified he was the second man to enter.  It was not light outside, but there was some light inside.  Toupin encountered a black man in the doorway of the bedroom.  The man was naked.  Toupin placed the man on the floor and called for another person to handcuff him.  The man did not struggle.  A female and child were detained in the bedroom.  Although Toupin testified he had his gun in the low ready position he claims he never pointed it at the man, woman or child.  Nor was the rifle pointed at them.  Toupin testified the team conducted a protective sweep of the apartment in about two minutes.  Once the protective sweep was complete, Toupin stated the scene was turned over to Kinal.

Toupin did not recall who the lead or first man into the apartment was.  Nor did he recall whether the door was wood or metal.  The door knocker was not used to knock on the door.  The team waited 10-15 seconds before forcing the door open.  A long ram was used to force the door open.  Everyone in the apartment was

12

cooperative; the female was very calm as he remembered.  He was only in the apartment two to three minutes.

As noted above, based on the affidavit and testimony presented at the hearing, Defendant's Motion to Suppress the Search Warrant is denied.

### B.    Motion to Suppress Evidence Based on Incriminating Statement

Defendant claims he was arrested in his home without a valid arrest warrant. He seeks to suppress the statements he made after the police entered the apartment. The Government in response argues there was a valid search warrant executed at the time and that Defendant was properly secured once the police entered the apartment. The Government claims Defendant signed a proper *Miranda*[1] waiver.

A defendant's statement must be "made freely, voluntarily and without compulsion or inducement of any sort."  *Haynes v. Washington,* 373 U.S. 503, 513 (quoting *Wilson v. United States,* 162 U.S. 613, 623 (1896)).  There are four warnings *Miranda* requires:  the right to remain silent; that any statement made may be used as evidence against the defendant; that the defendant has a right to the presence of an attorney; and, that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.  *Florida v. Powell,* 559 U.S. 50, 59-60 (2010).  The burden is on the Government to show proper advice and waiver of *Miranda* rights and

---

[1] *Miranda v. Arizona*, 384 U.S. 444 (1966).

13

prove the voluntariness of a confession, but the standard is only by a preponderance of the evidence. *See Colorado v. Connelly,* 479 U.S. 157, 168-69 (1986). In order to determine the voluntariness of a confession, a three-part test has been established. First, the court must determine whether the confession was extorted by objectively coercive police activity. *See United States v. Newman,* 889 F.2d 88, 95 (6th Cir. 1989)(citing *McCall v. Dutton,* 863 F.2d 454 (6th Cir. 1988)). The court may not proceed to the second and third parts of the test if the accused cannot show objective coercion by the officers because "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Connelly,* 479 U.S. at 167; *Newman,* 889 F.2d at 95. Regardless of a defendant's state of mind, a confession is voluntary absent police coercion. *Connelly,* 479 U.S. at 164. A finding that the first part of the three-part test has not been met ends the inquiry. *McCall,* 863 F.2d at 459-60. If the court determines there was objectively coercive police activity, the court must secondly determine whether the coercion was sufficient, considering the subjective state of mind of the defendant, to have overborne his will.

Finally, the defendant's will must have been overborne as a result of the coercive police activity. *Newman,* 889 F.2d at 95. To determine whether the defendant's will was overborne, the court should consider the totality of the circumstances. *Haynes,* 373 U.S. at 513; *Ledbetter v. Edwards,* 35 F.3d 1062, 1067

14

(6th Cir. 1994).  The following factors may be considered to determine the totality of the circumstances: 1) the age, education, and intelligence of the defendant; 2) whether the defendant was informed of his constitutional rights; 3) the length of the interrogation; 4) whether the question was repeated and prolonged; and 5) whether the officers utilized physical punishment, such as the deprivation of food or sleep. *Ledbetter,* 35 F.3d at 1067.  If the prosecution can show that a *Miranda* warning was given and understood by the accused, an accused's uncoerced statement, no matter the length of time the accused remained silent prior to the statement, establishes an implied waiver of the right to remain silent.  *Berghuis v. Thompkins,* 560 U.S. 370, 130 S.Ct. 2250, 2262 (2010).

Here, there is a signed waiver of the *Miranda* rights.  The Court must determine whether Defendant understood his rights, that he waived the rights and whether the statements were thereafter uncoerced.

Kinal testified that he entered apartment no. 313 after the protective sweep led by Shoemaker.  He and his crew were on the same floor, but did not enter as part of the entry team.  The NET crew entered after the SERT team left.  Some traditionally uniformed officers remained.  The female, identified as Lia Brooks, and a child, were seated on a couch in the living room.  Kinal did not recall whether they were clothed. Defendant was in the back bedroom and had a bed sheet or some other covering

15

around him, but was not clothed, and was still handcuffed.  Kinal took him into the

bathroom in the master bedroom.  Kinal had his gun in a leg holster, but never

removed it.  He was also masked, which he removed in the bathroom.  The bathroom

is a 6' x 5' room.  Kinal positioned himself against the sink.  Defendant was seated on

the commode, handcuffed in front.  Defendant was still unclothed, but had a covering

draped around him.  Kinal testified he presented Defendant with a written Miranda

rights form (Exh. 10) and he asked if Defendant could read and write.  Upon an

affirmative answer, Kinal asked Defendant the rights and initial each.  Kinal did not

require the rights be read aloud, but he stated he also believed he read them to

Defendant.  Kinal witnessed Defendant initial each right and sign the form.  Kinal

testified he then questioned Defendant.  Kinal stated Defendant told him:  he sold

small quantities of marijuana; there was a pistol in a boot on the top shelf of the closet

in the apartment; that he had purchased the pistol on the streets to protect his home;

that he sold drugs in the parking lot; that he used the money to pay bills; that his

girlfriend was aware of his drug sales; and, that he knew he was not supposed to have

a gun.

     Kinal stated that a loaded firearm was found in a boot in the closet, marijuana

and packaging were also found in the apartment.  The weapon was later determined

to be stolen during a car jacking.  Kinal indicated he did not recall whether he told

Defendant he was arrested or detained but stated Defendant was not free to leave and he was the focus of the investigation.  Kinal testified that Defendant "pleaded" with him to become an informant, but Kinal did not promise him anything.  Kinal told Defendant he could help him with charges if he cooperated.  Only $190 was seized during the search of the apartment and $40 of that was seized from Tia Brooks' purse.  Neither a large amount of drugs (only 41 grams) nor a large amount of money was seized from the apartment.  No ledgers or other evidence of drug trafficking were present.  Defendant was finally permitted to dress prior to leaving the apartment.  He was put under arrest upon being transported to the Southfield Police Department.

It is clear Defendant understood his rights and signed the Miranda rights form.  He is of sufficient age, intelligence to comprehend and understand the verbal and written statement of his rights.  Testimony indicates he was given these rights verbally and in writing including his right to an attorney.

Regarding the length of the interrogation–the entire search of the apartment was from about 6:30 a.m. to 7:00 a.m.  The interrogation lasted a short time and was not a particularly lengthy period.  There is no testimony that the questioning was prolonged or repeated.

As to whether the officer used punishment or any deprivation such as food or sleep, Defendant's statement was taken in a small bathroom.  Defendant was taken

17

directly to the bathroom, he was not allowed to dress; he had only a drape or covering over himself.  Later he was allowed to dress.  There is no testimony he was sleepy or asked for water or food.  The court is concerned about the fact that he was unclothed but no testimony about this was asked of the Defendant.  Defendant did say he was scared, but not scared into making a statement.  He could read and understood his rights–"you help me, I'll help you"–but neither Defendant nor his testimony rise to the level of police coercion required for suppression of statement.

Based on the totality of the circumstances, the police activity was not sufficient to overcome Defendant's will.  Defendant's claim his will was overborne by the police activity was not met here.

### C.    Revocation of Detention Order

The Court may review the magistrate judge's order detaining a defendant.  18 U.S.C. § 3145(b).   A review of a Magistrate Judge's detention order is a *de novo* hearing.  *U.S. v. Jones*, 804 F.Supp. 1081 (S.D. Ind. 1992); *U.S. v. Delker*, 757 F.2d 1390, 1394 (3d Cir. 1985); *U.S. v. Moore*, 2011 WL 2516459 at *1 (E.D. Mich. Jun. 23, 2011)(unpublished).  The district court must order detention if, after a hearing, it concludes "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community . . . ."  18 U.S.C. § 3142(e).  The government has the ultimate burden of

18

proof by clear and convincing evidence that the defendant presents a danger to the community and that no condition or combination of conditions could reasonably assure the safety of the defendant or of other persons and the community. *United States* v. *Hazime*, 762 F.2d 34, 37 (6th Cir. 1985). The district court must make findings based on the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger posed by the person's release. 18 U.S.C. § 3142(g). This matter is a presumption case under § 3142(f)(1), which is rebuttable by the defense. Each factor is addressed below.

(1) As to the nature and circumstances of the offense charged, Defendant is charged with: felon in possession of a firearm (carrying a maximum penalty of ten years in prison); possession with intent to distribute marijuana (carrying a maximum penalty of five years in prison); and firearm in furtherance of drug trafficking (carrying a minimum penalty of five years up to life in prison).

(2) As to the weight of the evidence against the person, the Indictment establishes probable cause for the offense. *Hazime,* 762 F.2d at 37.

(3) As to the history and characteristics of the person, Defendant has spent most of his life in this District, but with no stable residence. At the time of his arrest, he was living with a girlfriend and their child. Although he reported he was living with

19

the parents of his girlfriend, the parents advised Pretrial Defendant could not live with them any longer. Family members have also declined to house Defendant. It appears Defendant has no employment, although he told Pretrial he was a home healthcare aide. Defendant has a criminal history beginning in 1999 which includes multiple felony weapons offenses and burglary. He was recently discharged from parole following a 2007 conviction of felony assault with a dangerous weapon and has prior violations of probation.

(4) As to the nature and seriousness of the danger posed by the person's release–as noted, this is a rebuttable presumption case. Based on the offenses at issue and his past criminal history, Defendant is presumed a danger to the community.

(5) As to risk of flight, it does not appear that Defendant would be a flight risk, although he is facing a maximum of penalty life sentence.

Weighing the factors noted, there are no conditions or a combination of conditions which would reasonably assure the safety of others. Defendant has not rebutted the presumption.

## III.   CONCLUSION

For the reasons set forth above,

IT IS ORDERED that Defendant's Motion to Suppress Evidence Seized Pursuant to Search Warrant and Obtain Evidentiary Hearing (**Doc. No. 28**) is

20

DENIED.

IT IS FURTHER ORDERED that Defendant's Motion to Suppress Evidence and Incriminating Statement (**Doc. No. 30**) is DENIED.

IT IS FURTHER ORDERED that Defendant's Motion for Revocation of Detention Order (**Doc. No. 29**) is DENIED.

IT IS FURTHER ORDERED that the Trial date which was set for July 30, 2013 is rescheduled to **Tuesday, January 7, 2014, 9:00 a.m.**  The witness and trial exhibit lists must be served on the defense and the Court by December 23, 2013.

S/Denise Page Hood
Denise Page Hood
United States District Judge

Dated:  November 12, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on November 12, 2013, by electronic and/or ordinary mail.

S/LaShawn R. Saulsberry
Case Manager

21